is Maldonado Pinedo v. United States of America. It is docket 19-4004. And counsel, we're prepared to hear your argument when you're ready. Good morning. May it please the court. My name is Jonathan Thorne and I represent Appellant Agent John Martinson. Before I begin today, the Plaintiff's Attorney, Mr. Jackson, who is also an appellant, I would like to reserve two minutes for him to give an argument on standing. We're here today to determine whether or not the government should be substituted for Martinson with regard to a claim under the Westfall Act, which relates to Martinson's use of force that occurred while he was an ICE employee at an ICE detention center. If Martinson was acting within the scope of employment, the government must be substituted for Martinson on that claim. Today, for purposes of argument, we can assume that Martinson's conduct was an overreaction, that it was wrong, but that does not take it outside the scope of employment. And the two issues that I want to address today relate to the district court. Can't we assume a lot more than that, which is to say, don't we assume what the district court found, namely that his account was not credible and that he had done this for a personal reason? Well, we can assume. Don't we have to assume? Yes, we can. Yes, we do. And the two issues that I want to address relate to the court's error in the analysis of the law. And the first being that the court looked at the situation in a vacuum, as opposed to looking at Martinson's overall job duties in conjunction with the situation and what he was doing. The second issue that I want to address is the court's error in looking at motivation. There, the district court failed to properly analyze Martinson's motivation in conjunction with the business interests of ICE. So I want to briefly address some of the details as determined, facts as determined by the district court. On July 3rd, 2013, Agent Martinson was working as an ICE agent at an ICE detention facility. His duties included maintaining order at the jail and overseeing detainees. On the morning of the incident, he was tasked with counting the number of detainees they had to determine whether or not they were, whether or not they had enough vans, because this was a temporary housing center. They didn't hold them overnight. So the detainees were brought to this facility to be processed and told about their court dates, and then they're transferred back to the jails. So Mr. Martinson was trying to count the detainees and he had a detainee that was blocking the window. And so he asked the detainee to sit down and the detainee disobeyed his commands. As a result, Mr. Martinson determined that he needed to take down the detainee and place him in an isolation cell. In doing so, he shackled the detainee up, and as he was transporting him, the detainee continued to disobey his commands and he did a takedown maneuver, injuring the detainee. That's not what the district court found. District court didn't find that he continued to disobey, that there was a finding there that he had said that he had tensed his arm or something, but then watching the video did not see that. The other two agents behind did not see that. Don't you have to stick to the facts that the district court found? Yeah, and I believe she found that Martinson gave him commands of stop disobeying me. And she did in her findings, she talked about him disobeying his commands and disrespecting his authority. And it wasn't directly clear if that disrespect of authority, I mean there were some commands he was given when he was in the cell, but he was also giving commands and I believe she found that, you know, Martinson was making these statements. She determined that there was little to no resistance based on the video. Well, Counselor, here's my problem. Since you've got us assuming what the district court did, then how can you clearly show that he would be acting within the scope and course of his employment under the Bertner framework? Yes. I mean, you've almost, to me, assumed away your case. So tell me exactly how you're going to get around that. Sure. And I think there's a particular case, I mean these cases all look at the overall situation in conjunction with the duties. And there's a particular case that is... Are you focusing on the first factor when you say that the general kind, conduct must be of the general kind that the employees... Yes. ...plugs for? Yes, thank you. So there's a particular case that's instructive here that's directly on point, which we cited to. And that's the Bowman v. Hayward case. And it's a Utah Supreme Court case. And I recognize it's from 1953, but it's still good law. And it was cited with approval in Clark v. Pagan when that court was saying that intentional torts can be within the scope of employment, including assault. And there the facts are almost identical. There there was a deputy sheriff that was tasked with maintaining order at a jail. And he directed, he was tasked with overseeing inmates. And he directed one of the inmates to go and wash his personal automobile in the parking garage. When the inmate disobeyed his command and refused to follow his orders, the deputy sheriff attacked and repeatedly assaulted the detainee. And there the court said that the evidence so overwhelmingly supports the conclusion as to make it a matter of law that the deputy sheriff was acting in the scope of employment. Well, that Bowman case is interesting. In 1953, and I have to wonder about the result today, but all that, you know, not considering that, that it seems almost unbelievable that, you know, assaulting a, an inmate who wouldn't wash your personal vehicle was within the scope of employment. There was in that case, something distinct from this case, which was another guard who, or other deputies, whatever, who testified that, that yes, washing personal vehicles, the inmates washing their personal vehicles was something that they were asked to do and considered, it was considered within the scope of their employment to ask them to do that. Now, how that means that the, the assault on the officer for not performing, for not performing that task was within the scope, I don't know. But my point is there was a factual difference here because we don't have anybody here that was present on the witnesses indicated that this was an appropriate action under the circumstances, did they? Well, that was focusing on the tort itself, the intentional tort. Like in the Bowman case with the washing of the automobiles, Martinson was within, and the court found it was within his lawful duties to direct this detainee to sit down, to shackle him up and take him to the, the transport. But the Bowman case, they didn't focus on the intentional tort. But they said that this, this deputy sheriff, he was clothed in his official character. He was, it was his official position that prompted this oppressive act. And like Martinson, it's his official position that prompted the oppressive act. It was, you know, the overall situation and circumstances. Yes, he overreacted. He shouldn't have, I'll admit today, he shouldn't have done that. But it's so, such of such relation to his type of job duties, you know, he's trained, we got to, we got to take into consideration the, the environment, the work environment. This isn't an office complex. This is a, you know, a potentially scary place. It's a detention center that houses criminals, some of whom are violent. And because of that, ICE trains their officers on, you know, maintaining order and to taking action when the detainees don't listen to them. And part of that, something they're taught, is the use of force. So looking at this in a, in a totally, you know, different way, it's outside the scope of employment if he was wholly involved in a personal endeavor. That means, you know, he has to be on an independent course of action. As MJ vs. Wyson says, it needs to be a departure from his job duties. Now departure has been defined by the Utah Supreme Court. And in Berkner, when they're talking about scope of duty, they cite to Carter versus Bessie. And I don't think we cited that in our, in our documents, but Carter versus Bessie defines departure. And it says that a course of conduct that is a departure is something that is in no way related to the business interests of the employer. So that means it's got to be some sort of conduct that has nothing to do what, with what he's been involved in. So what's, what is the limit? What if he would have taken a billy club and hit him over the head 20 times? Well. Fully in body change. Given that this is a situation in which Martinson is trained to do those duties, you can't look at the intentional, the intentional tort. This is the type of conduct that's reasonably incidental to Martinson's job duties. He's been trained on that. What's the answer? If he would have hit him 20 times with the billy club, that would be fine because he was transporting him to a cell? In this situation, I think using a billy club on the detainee is within the scope of employment basis. Is there anything that isn't? What if he would have fired a gun at him? Well, in this situation, Martinson, it's a facility that doesn't allow weapons within the facility. But yes, he, I mean, you got to look at the situation of, you know, ICE is providing, if they provide him a gun and they're providing, you know, these people billy clubs, this is under Utah law. It's incidentally related to the type of conduct they're employed to perform. Was there any testimony from anyone that suggested in this situation, which was a, uh, an inmate who was, or a detainee who was fully shackled, fully shackled and being walked a short distance from cell to cell by four guards, right? Four guards and fully shackled. Yes. He couldn't defend himself. He couldn't break his fall. He couldn't do anything, uh, apparently other than maybe make some slight movements. Um, is there any suggestion in the record that under that scenario, it was ever appropriate to do the type of takedown that your client did here? There is evidence in the record and it was ignored by the district court. Both Martinson and Aubrey testified that they had been trained on doing takedowns on partially restrained detainees. I'm talking about fully restrained. But they also said that the instructor told them that, because somebody posed a question to the instructor, what if he's fully restrained and the instructor said, then you do the takedown. I mean, these guys are, uh, as the government... Why? Why? I mean, I, was there an explanation for that? It doesn't make sense to me. You know, there is, there is that... Obviously the district court must have found that not credible, I take it, because she believed the, the United States expert who said there's basically in this scenario, there's never a reason to do a takedown. And this was the individual who trained these officers. Well, she ignored that evidence, but she did, she did believe the government's... She did believe him. Yes, that's correct. And you're not challenging that in terms of being clearly erroneous. But that would never essentially, her finding that what he said was true, which is that there's just not a, under this scenario we have here, it would never be appropriate. Well, that's, she also ignored testimony from the expert that said there are circumstances in which you could do a, a takedown on a fully shackled detainee. That's in the record. But that brings us back to the, to the standard of how we review in this case, because under the law, she's given the authority to make the findings and conclusions in regards to this. And we just can't ignore that. Even though I might have found differently, doesn't allow me to substitute what I would do for what she did. Now, that means you've already cited to, we, you've got to show as a matter of law that her ruling is wrong. Not based upon the facts, but based upon the law. Now, what law gives us the authority? Did she ignore other testimony that would weigh on this, this factual decision that she made completely? Well, one thing she, she discussed was we had raised an issue of policy. There was no policy that prohibited or even addressed the issue of doing a takedown. And she said that wasn't significant. But as the Berkner case says, they relied exclusively in finding that employee was outside the scope of employment by the employee admitting that it was a personal endeavor, had nothing to do with the business relationship, and the employer's policy, which strictly prohibited the conduct in that case. In that case, it was a therapist that, who had sexual relations with a client. And the policy specifically said you are not allowed to have sexual relations. And there's also a regulation for that person's license that prohibited it. And that's what the Berkner court relied on. I see that I'm running out of time here, and I'd like to reserve the remaining two minutes. Thank you. May it please the court and good morning. My name is James Jackson. I represent Appellant Pinedo on this matter. This court specifically asked me in my appeal to address the jurisdictional standing issue of my client. So I want to touch on that briefly. The leading case on this is Cohen v. Beneficial Industrial, which lays out three factors on whether an interlocutory appeal can be had. And if you have standing, those factors are one, if the order conclusively decided a disputed issue, which we have a disputed issue conclusively decided here on December 4th. We have number two, whether the issue is completely separate from the merits of the case. The merits of this case involve assault and battery. This order and this appeal is regarding a Westfall petition. And number three, and most importantly, is if the order would be effectively unreviewable on appeal from a final judgment. Now our position is who your defendant is plays a big role in how you litigate and try a case, your trial strategy and preparation. So our position is that knowing who our defendant is, whether we have a solvent defendant or not, is unreviewable on appeal. So we believe that we do in fact meet those three elements and have jurisdiction and standing to raise this appeal. And I have about 50 seconds left, and I'd like to save it for rebuttal from Mr. Thorne, if that's possible. Good morning, may it please the court. My name is Levi Martin for the United States. And counsel, I think you've got, to me, a very important, all the cases usually are very important up here, but in looking at the facts of this case, do you acknowledge that Mr. Maldonado, he admitted that he tensed up and wasn't following instructions given to him. So the fact that the trial court found that the officer's testimony wasn't credible, but there is still other evidence that supports what the, in this instance, what the officer's claiming, isn't there? I would say that there was evidence of him tensing up. He admitted something about his shoulder dropping down or something like that. I wouldn't say that that's any evidence of significant resistance. And that's the critical part. It's evidence of resistance, though, isn't it? That's not the way that Mr. Maldonado characterized it as resistance. It was an adjustment. He was being pushed in full shackles. I don't think that he characterized it that way. And more importantly, although the video is not perfect evidence, it misses audio and it's not the best quality, more importantly, what we have is two individuals who testified on behalf of Mr. Martinson. They were sitting there, they observed the same thing that he did. And these are persons who are colleagues of his. They're walking the same side of the thin blue line and they didn't see anything that was worth intervening for. They didn't see any resistance. And that's what's important about what the trial court was able to observe at the time during the evidentiary hearing. She's the one that's able to look these people in the eyes while they're testifying. And when you read the transcript, you can see that counsel tried really, really hard to get them to say that there was resistance going on and they didn't see it. They didn't remember seeing any resistance. There was, Mr. Coste said at one point, very close to what was to be the next cell that he was going to get into, change direction or something. But then he admitted on cross-examination, the fact is that Mr. Maldonado might have actually been waiting for the door to open that was right there. And so while Mr. Maldonado did indeed say that he moved his shoulder, the court acknowledged that, I think, to some extent in the order, too. She said little or no resistance. And so there's an acknowledgment that maybe there was, but it certainly didn't justify what took place. And quite frankly- But you're saying that the trial court did recognize that and addressed it in her words? That's absolutely correct. In fact, I think that's what she said was little or no resistance. And so I think that's an acknowledgment of the fact that Mr. Maldonado did make that statement. It's also, I think she called the other individuals, the other detention officers testimony as either not remembering the resistance or providing vague and odd answers, which is consistent with the fact that not only did they not see the resistance, but importantly here, they not only didn't corroborate his story, they also significantly damaged it by saying, we also heard him saying stop resisting, which is intuitively a cue to be kind of paying attention and they still didn't see it. And that was part of the theory, which is all of this was a pretext. From the time that he pulled him out of that cell, there was an intent to do this individual harm. And not only is that presented by virtue of Caleb Vitello, who is the use of force expert within ICE, but it's also again with these other two detention officers. They said, I don't remember ever seeing Mr. Martinson before or after chain somebody up on there by themselves. It is certainly not the protocol to put somebody in full restraints to move them 30 feet from one cell to another cell inside of a locked building, three behind three locks and three other individuals that are helping with the restraints on, except for the fact that he intended to show this individual who was boss and he was going to punish him. And what better way to do that than to put him into full restraints. Could you address the Berkner criteria, specifically the first criteria, which the district court found weighed in favor, as I understood her decision, weighed in favor of the United States and that is that an employee's conduct must be of the general kind. Employee, essentially, wasn't he performing generally? I mean, if you're looking at this generally, this is what he was hired to do. These officers were escorting a shackled detainee from one cell to the next. That, they were performing generally. Maybe not specifically if you're looking at the takedown, but generally he was certainly within the scope of his employment in escorting an officer or escorting a detainee. And thank you for the question, because I think that's an important distinction between what the court found and what Mr. Martinson has been trying to advocate for since the beginning of this issue. And that is, no, you can't string together three different ideas of, yes, we, as part of our job duties, move people from one cell to another. Yes, as job duties, we do takedowns. Yes, as job duties, we also apply shackles. That's based on a false premise in this case, because that's not what he was doing. He wasn't intending to just move this individual from one cell to another. The intent was for him to do harm and it was an entire false premise. And how do we know that? Because all of his actions are inconsistent with what he was saying he was doing and why. Can you point me to case law that supports what you're saying on that first Berkner factor, which is that you don't look at the general scope of their employment. You look, you hone right in on the specific act that is in question. Which I think I understand your question. It's really kind of implicitly taking a bit of a motivation as part of it. Well, no, you're arguing subjective versus objective. And that's what the court's asking you. You're saying, well, there's evidence that he intended to do that. That's a subjective matter. What supports your position that it wasn't, you know, that as to the first criteria, it says general. Right. And the third criteria, as Judge Balduck points out, is the subjective criteria. And that's not what I'm asking about. I'm asking about the first criteria. And I didn't see any case law that really necessarily supports your position. And I'm not sure there's case law the other way. I'm just no, there's not a lot out there. I would be asking you. Yeah, I don't I don't have case law that would specifically answer the question that you're asking. I think the way I would respond to that is this wasn't some sort of, you know, unfortunate extension of lawful duty. It was a complete abandonment, abandonment of it. There was not ever in training or any sort of idea, either from the lawful perspective of a takedown with a fully restrained individual that just didn't happen, that's never been trained on. And so I think that's the distinction is whether it's motivation or not involved as part of it. Could you tell me what if we disagreed with the district court on the first factor and said that that weighed in favor of Mr. Martinson? And I understand there's an issue about the second factor, but assuming which clearly, if it still exists, weighs in his favor also. Is there any guidance? Have we gotten any guidance from the Utah courts on how you would weigh, essentially, the factors or the criteria? Is it a, okay, two on his side, one on his side, and so he wins? Or is it more complex than that? No, I think it's pretty clear from all of the Utah cases that, you know, at one point it was three prongs and now it's two. I think that's pretty clear, but there may be some dispute with that. But you have to meet, you have to satisfy them all. And so even if the district court found, she also made the finding that his actions were taken out of a personal desire to physically punish the individual for disrespecting his authority and that he acted solely from personal motives. And so that's the third prong there. And in addition to that, you have this other sort of, I don't know if you'd call it kind of a way to weigh the motivation factor or not, but critically important, and I think somewhat gets lost here, is there is no liability if it's out for personal motives or if it's unprovoked, highly unusual, and I can't remember the last one, something about grossly, I've got it written down here. Well, let me just say, I don't think, I didn't see Utah law supporting what you just said, which is that you've got, he's got to prove all three factors. They've been pretty clear about saying there are three criteria, which is what they call them, that are relevant to the determination. I didn't find any case law, and I'd like you to point me to some if you have some, saying all three must be met. Well, I think, I'm not, I'm sure I've actually seen it where it says you must prove all three, but it's the way it's written. It's the way they've always been analyzed. I think Clark v. Pangan perhaps is probably the best case that would demonstrate you have to, in fact, I think they said something along the lines of one of the parties had lobbied for an expectability prong, and that was consistent with the restatement at the time, and I think it's essentially what counsel's arguing for now, but the court declined there, stating the expectability is already taken into account by applying the three elements of the Berkner test while considering the conduct that is unprovoked, highly unusual, and quite outrageous should be outside the scope of the employment. And so, really, if there's one, and it's generally of the job that he's assigned to do, it shouldn't matter if it's completely outside the scope when it's unprovoked, highly unusual, or quite outrageous. On that point, and looking at the first Berkner factor, which I want to hear your view of that, what I'm looking at is MJ, and it cites Berkner, and it lists as the first factor whether the agent's conduct is, quote, of the general kind the agent is employed to perform. So conduct's a big word there. Is it your position that if conduct is something that's allowed to be performed, for instance, if this individual had gotten out of the cell and was running free and there's a takedown, that would be conduct that's allowed to be performed, but you have to measure that conduct within the context of the facts that existed in this particular case. Exactly. In other words, the conduct might be within general duties. The same conduct might be within general duties in one circumstance, but not in another. No, that's exactly correct, Your Honor, and I think I would add to it, the really important part here is these facts include an individual who's entirely restrained, completely unable to defend himself, and Mr. Martinson didn't sit him down, didn't push him up against the wall. He put his hand on the back of his neck and slammed him into the concrete floor. That is not conduct of a general nature that ICE is ever supposed to perform, and that's what the expert indicated. Well, I think it goes back to what the judge is mentioning. It depends on the facts and what's actually happened, and that brings me back. You agree that under the act that we're looking at, the trial court gets to make the findings, and we're bound by those findings unless by some violation of the law, and she's gone too far. That's correct, and I think I want to make two points on that. First, it is the general rule in Utah that scope of employment issues, the factual question is going to be decided by the trier of fact. That's the state law for Utah. That's what they've said, and secondarily, the standard for this court would be whether or not she made clearly erroneous findings, and I would submit to the court there's absolutely no basis to determine that she made any clearly erroneous findings. In fact, I think it's to the opposite. While you've got a little time left, would you address the Cohen matter, whether or not you agree that there's jurisdiction in regards to Mr. Maldonado's claim? Yes, thank you. It appears as if the appellant, and that being Mr. Maldonado, believes that somehow they have more right to an appeal than they would have had down below. I mean, the fact of the matter is he could not have asked the district court to review the decision of the United States Attorney as to whether or not Mr. Martinson was within the scope of his employment. He couldn't have done that down below. It doesn't make any sense why he would be able to now, interlocutory, bring that up in front of the Tenth Circuit. I mean, there are unique reasons why you get to do this on an interlocutory basis, and immunity is one of them, and Mr. Martinson is being denied that immunity under the Westfall Act by virtue of that United States Attorney's decision. And so it's not the United States position that Mr. Maldonado has the ability to appeal this on an interlocutory basis. He still can't- So are you talking about standing, then? You title this section standing in your brief, basically, but then you talk about Cohen, which is the appellate jurisdiction, the collateral order doctrine. I guess I'm a little confused by your argument. You never cite any cases discussing standing. That seems to be what you're arguing. I guess so. I don't remember exactly what cases I did cite for that proposition, but- Well, standing was a term you used in your heading, but then you didn't really discuss standing beyond that. Right. Yeah, I don't know how to respond to that, whether or not it's a case that I should have cited, or whether or not it was standing that they're trying to provide jurisdiction for. Thank you. Briefly, the Berkner factors are criteria. As MJ focused on the first element in saying that we hold the key question as whether or not justice was acting within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. I also want to briefly discuss motivation. Motivation requires that it be in no way connected to the employer's interests. Here, but for the detainee disobeying Martinson's command, this wouldn't have happened. Martinson may have been misguided, it was wrong, but his motivation came out because of his job. It wasn't a personal endeavor, purely personal. It was related to the employer's interests. Well, what the court says is Agent Martinson purposely punished Mr. Maldonado for questioning his authority. Yeah, and so if you look at what the case law requires, a personal motive in no way connected with the employer's interests. So when she's saying that he took this action because the detainee was disrespecting authority, his authority, he's clothed in his official character. He is acting as ICE, and you've got a detainee that's disrespecting and disobeying ICE, and but for the disobedience, this action would not have occurred. If I can, I realize I'm out of time, but if I can give an analogy. Is the disobedience the supposed tensing of his arm, which the court recounts the Agent Martinson's testimony on that. I'm not sure it makes a finding, but is that the disrespect or is it what happened in the holding cell? I think it's a continuation of events that started with the detainee refusing to sit down, doing laps around the jail, turning his back, and refusing to obey his commands, and then when he was walking with them, as Martinson said, and as the detainee testified to, there was this pulling away. And these guys, they're trained on these takedowns that when they receive any resistance, they're finely tuned machines, where when they feel that, they've been trained to no dithering about, to hurry and do a takedown. And while it was misguided here, it's the type of conduct he was employed to perform. All right. Well, thank you both for your arguments. The court will take the matter under advisement and we will stand in recess until 9 a.m. tomorrow.